The Bessemer Water Service ("BWS"), a department of the City of Bessemer, appeals from the trial court's order enforcing a contract entered into by the mayor of the City of Bessemer on BWS's behalf with the Lake Cyrus Development Company, Inc. ("LCDC"). The contract, BWS alleges, violated § 39-2-2, Ala. Code 1975, which requires all contracts for public-works projects to be advertised and bid upon. BWS also alleges that the mayor of Bessemer, who executed the contract on behalf of BWS, lacked the authority to bind BWS to the contract. We reverse and remand.
 I.
In 1997 John C. Rockett, Jr., a BWS ratepayer, and other BWS ratepayers sued BWS and other parties, alleging that BWS had misused public funds and had thereby harmed the ratepayers by inflating the amounts they were charged for their water consumption. The trial court initially certified the case as a class action; however, this Court directed that the order certifying the class be vacated. Ex parte Water Works Sewer Bd. of Birmingham, 738 So.2d 783 (Ala. 1998). Thereafter, the case was delayed for several years for a variety of reasons; it eventually evolved into what the trial court described as "a declaratory-judgment action against [BWS] concerning its pricing policies and the manner in which it distributes its revenue."
On May 19, 2004, the trial court entered an order holding that BWS had likely been violating the law in regard to its practice of transferring substantial funds each year to the general fund of the City of Bessemer "without any legal or industry standard being utilized to determine whether the rates being charged or funds transferred were reasonable." The trial court stated that BWS's practice of transferring funds without using any standard conflicts with the legal requirement that utility customers be charged a reasonable and nondiscriminatory rate. See WaterWorks Bd. of Parrish v. White, 281 Ala. 357, 361,202 So.2d 721, 724 (1967) ("The law will not and cannot tolerate discrimination in the charges of a water works company. There must be equality of rights and special privileges to none; and, if this is violated or unreasonable rates are charged, the humblest citizen has the right to invoke the protections of the laws equally with another.").
The trial court noted that BWS's practice of transferring funds to the general fund of the City of Bessemer was particularly suspect inasmuch as BWS also provided water to, and received income from, customers in Hueytown, Midfield, Brighton, Hoover, and Lipscomb. The ratepayers in those cities did not receive services from the City of Bessemer but were, in effect, subsidizing its general fund.
Accordingly, the trial court, in its May 19, 2004, order, enjoined BWS from transferring any further sums to the general fund of the City of Bessemer except for certain approved expenses and reimbursements, until BWS completed a water-rate study that would allow it to implement a rate structure that provided a reasonable and legal rate of return to the City of Bessemer for operating BWS, in line with accepted industry standards. The trial court further stated that it would retain jurisdiction over the case until such a rate structure was implemented and that it *Page 646 
would "always be open to [the parties] in the event it is found that any associated entity, through action or inaction, in any way impedes or hampers [BWS] in the implementation of the requirements of this order."
On December 6, 2004, BWS and Rockett, the only remaining plaintiff in the case, jointly moved the trial court to add LCDC to the action as a necessary party pursuant to Rule 19(a), Ala. R. Civ. P. BWS and Rockett alleged that LCDC was hampering BWS's ability to comply with the trial court's May 19, 2004, order inasmuch as LCDC was refusing to renegotiate an allegedly invalid contract it had entered into with BWS in 1998 ("the 1998 water agreement"). The trial court granted the motion and added LCDC as a necessary party in the case. That same day, BWS filed a cross-claim for declaratory relief, asking the trial court to relieve it of the allegedly invalid provisions in the 1998 water agreement and to determine whether LCDC was obligated to return to BWS any of the funds it had previously received from BWS under the 1998 water agreement.
The 1998 water agreement was entered into on April 30, 1998. The contract was signed by the then mayor of Bessemer, Quitman Mitchell, who by statute also served as the manager of Bessemer Utilities,[1] and by Charles Givianpour, the president of LCDC. It was the product of two months of negotiations that began when Mayor Mitchell and Charles Nivens, operations manager for Bessemer Utilities, approached Givianpour and asked him to use BWS, instead of Birmingham Water Works, as the provider of water to the new Lake Cyrus residential development in Hoover.[2] BWS was interested in providing water to Lake Cyrus not only to increase its customer base, but also to further its reach. Toward that end, BWS expressly negotiated for LCDC to increase the size of the main water line within the development (running from Highway 150 to Parkwood Road) from a 12-inch line to a 16-inch line to allow for future expansion.
The 1998 water agreement obligated BWS
 "to provide potable water to all residential, industrial and commercial areas within the [Lake Cyrus] development at the same rates and upon the same terms and conditions (as modified by the terms and provisions of this agreement) as BWS provides water service to all other residential, industrial and commercial customers, respectively, of BWS."
(Emphasis added.) The terms and provisions of the 1998 water agreement had been modified; they were not the terms and provisions of the typical BWS water-services contract. Nivens and Terry Hinton, water-distribution superintendent at BWS, testified that it was BWS's standard procedure to fund the cost of a water-main extension for a residential development to the point of the entrance to the development and that the developer customarily paid all costs associated with bringing water from that point into the development, including the construction of the interior main extension, the submain, and the lateral lines. However, under the 1998 water agreement, BWS agreed to pay LCDC *Page 647 
$273,000 as "a partial deferment" of the costs LCDC incurred in installing the interior 16-inch main extension, the submains, and the associated water valves. Moreover, BWS agreed to reimburse LCDC on a monthly basis for all costs and expenses LCDC incurred in installing the lateral water lines within the development.
It was also standard BWS practice to charge a "tap fee" to each new customer that requested water service. The tap fee was used to offset the cost of extending the water main to the entrance of a new development and the cost of maintaining the water lines in the development after the lines were installed and tendered by the developer for BWS's acceptance. However, the 1998 water agreement required BWS to remit to LCDC, on a monthly basis, 100% of the tap fees collected in the development.
Aside from the provisions mandating a $273,000 payment to LCDC, the reimbursement of LCDC's lateral-line construction costs, and the transmittal to LCDC of 100% of the collected tap fees, BWS also identified the following requirements in the 1998 water agreement as deviating from the terms and conditions of its standard water-services contract: 1) BWS was to provide and install all fire hydrants; 2) LCDC was to retain an option to repurchase all of the waterworks in the development after they were tendered to BWS; 3) BWS was required to keep the contents of the 1998 water agreement confidential; and 4) all late payments by BWS accrued interest at the rate of 18%.
In 2002, Edward May was elected mayor of Bessemer. May replaced Mayor Mitchell and began his term on October 7, 2002. Mayor May initially continued to sign the reimbursement checks being sent to LCDC under the 1998 water agreement. However, in approximately May 2004, after reviewing a copy of the contract, Mayor May began to doubt the legality of the 1998 water agreement. After consulting with the City's attorney, Mayor May sent LCDC a letter, dated August 9, 2004, informing it of the City's position that the 1998 water agreement was void and requesting that legal counsel for the City and for LCDC meet and discuss the options.
The relationship between LCDC and BWS rapidly disintegrated. Because BWS would not pay LCDC $202,990 in reimbursements LCDC was claiming under the 1998 water agreement for finishing the interior 16-inch water-main extension through the back of the subdivision to complete the connection with the main BWS line at Parkwood Road, LCDC refused to complete the work. BWS was anxious to have the extension completed because the connection at Parkwood Road would "loop" the system. In response, BWS delayed approving water lines connecting the remaining sector of the Lake Cyrus development, causing delays in residential construction.
On December 6, 2004, BWS filed its cross-claim seeking, among other relief, relief from the allegedly invalid provisions in the 1998 water agreement that required it: 1) to remit to LCDC $71,540, the outstanding balance of the $273,000 partial-deferment payment; 2) to further reimburse LCDC for costs and expenses associated with constructing lateral lines; 3) to turn over to LCDC 100% of the tap fees that were collected in the development; 4) to sell LCDC all the water lines in the development if LCDC elected to exercise the purchase option; and 5) to keep the terms of the 1998 water agreement confidential. BWS also asked the trial court to enforce the valid portions of the 1998 water agreement so as to allow BWS to continue to provide water to the Lake Cyrus development. Finally, BWS asked the trial *Page 648 
court to determine if it could recover any of the funds previously paid to LCDC under the 1998 water agreement and to declare that BWS was the owner of all of the waterworks within the Lake Cyrus development that had previously been tendered by LCDC and accepted by BWS.
LCDC thereafter filed a "motion for emergency expedited and injunctive relief," asking the trial court to order BWS to supply water to the final sector of the Lake Cyrus development as promised and to pay LCDC the money LCDC was claiming under the 1998 water agreement. LCDC further asked the court to enjoin BWS from future breaches of the contract.
The trial court held a bench trial on all pending matters in the case from February 28, 2005, through March 3, 2005. On March 7, 2005, the trial court entered an order finding the entire 1998 water agreement to be valid and entering a judgment in favor of LCDC. On March 8, 2005, the trial court entered an amended order, ordering BWS to pay LCDC $224, 979. 83 in damages.[3] BWS appeals.
 II. "[W]hen evidence is presented ore tenus in a nonjury case, a judgment based on that ore tenus evidence will be presumed correct and will not be disturbed on appeal unless it is plainly and palpably wrong or against the great weight of the evidence. Eagerton v. Second Econ. Dev. Coop. Dist. of Lowndes County, 909 So.2d 783, 788 (Ala. 2004). Nevertheless, this rule is not applicable where the evidence is undisputed or where the material facts are established by undisputed evidence. Salter v. Hamiter, 887 So.2d 230, 233-34 (Ala. 2004). Additionally, when the trial court `improperly applies the law to the facts, the presumption of correctness otherwise applicable to the trial court's judgment has no effect.' Ex parte Bd. of Zoning Adjustment of Mobile, 636 So.2d 415, 418 (Ala. 1994)."
Hartford Cas. Ins. Co. v. Merchants FarmersBank, 928 So.2d 1006, 1009 (Ala. 2005). In the present case, the evidence was presented to the trial court ore tenus. However, because the material facts are undisputed, the trial court's decision is entitled to no presumption of correctness and this Court will review it de novo.
 III.
BWS argues that the trial court erred in holding the 1998 water agreement valid for two reasons. First, BWS argues that, because the 1998 water agreement obligated BWS to at least partially fund the construction of the water lines inside Lake Cyrus, that construction was a public-works project pursuant to §39-2-1(5), Ala. Code 1975, and BWS's payments to LCDC to complete the construction therefore violated § 39-2-2, Ala. Code 1975, which requires that all public-works projects be advertised and bid upon.
Second, BWS argues that Mayor Mitchell had no authority to enter into the *Page 649 
1998 water agreement because § 11-43-56, Ala. Code 1975, vests sole management and control of city finances in the Bessemer city council. BWS argues that Mayor Mitchell, in his capacity as the manager of Bessemer Utilities, had only the limited authority to enter into "standard" water-service contracts. BWS argues that any contracts that significantly departed from the terms of the standard contract, as the 1998 water agreement unquestionably did, would have to be approved by the city council to be valid.[4]
We first consider BWS's argument that the 1998 water agreement violates the mandatory bidding and advertising provisions of § 39-2-2. Section 39-2-2 provides, in pertinent part:
 "(a) Before entering into any contract for public works involving an amount in excess of fifty thousand dollars ($50,000), the awarding authority shall advertise for sealed bids. . . .
 "(b) An awarding authority may let contracts for public works involving fifty thousand dollars ($50,000) or less with or without advertising or sealed bids.
 "(c) All contracts for public works entered into in violation of this title shall be null, void, and violative of public policy. . . ."
In § 39-5-6, Ala. Code 1975, and § 39-5-1(a), Ala. Code 1975, the legislature evinced its intent that entities strictly comply with § 39-2-2. Section 39-5-6 states:
 "The provisions of this title are mandatory, and shall be construed to require strict competitive bidding on contracts for public works. The courts shall not invoke or apply any principle of quantum meruit, estoppel, or any other legal or equitable principle which would allow recovery for work and labor done or materials furnished under any contract let in violation of competitive bidding requirements as prescribed by law."
Section 39-5-1 (a) states:
 "No civil action shall be brought or maintained by a contractor in any court in this state to require any awarding authority to pay out public funds for work and labor done, for materials supplied, or on any account connected with performance of a contract for public works, if the contract was let or executed in violation of or contrary to this title or any provision of law."
The purpose of these statutes is plain. Competitive bidding by sealed bids guards against opportunities for corruption in the procurement of contracts for public-works projects. These statutes make it clear that the legislature intended to erect impregnable barriers to prevent the misuse of public funds inherent in awarding public-works contracts covered by §39-2-2 without competitive bidding.
In order to determine whether the 1998 water agreement was entered into in violation of § 39-2-2, we must determine: 1) whether the 1998 water agreement is, in fact, a contract for public works; 2) whether the amount involved exceeds $50,000; and 3) whether the awarding authority advertised for sealed bids. The latter two determinations are easily made because *Page 650 
the 1998 water agreement on its face required an initial payment from BWS to LCDC of $273,000, and it is undisputed that there were no advertisements seeking sealed bids for the project. Thus, the relevant inquiry is whether the 1998 water agreement constitutes a contract for public works.
Section 39-2-1(5) defines "public works" as:
 "The construction, repair, renovation, or maintenance of public buildings, structures, sewers, waterworks, roads, bridges, docks, underpasses, and via-ducts as well as any other improvement to be constructed, repaired, renovated, or maintained on public property and to be paid, in whole or in part, with public funds. . . ."
(Emphasis added.) Section 39-2-1(4) defines "public property," as that term is used in § 39-2-1(5), as "[r]eal property which the state, county, municipality, or awarding authority thereof owns or has a contractual right to own or purchase,including easements, rights-of-way, or otherwise." (Emphasis added.) The 1998 water agreement granted BWS "all permanent, non-exclusive easements necessary for BWS to install water mains and otherwise provide water service to all areas of the [Lake Cyrus development]"; therefore, the waterworks constructed to serve the Lake Cyrus development meet the definition of "public works" in § 39-2-1(5).
In its brief filed with this Court, LCDC nevertheless argues that the definition of "public works" in § 39-2-1(5) does not encompass the work done by BWS in the Lake Cyrus development:
 "Lake Cyrus was not a `public works' [project] as defined under the bid law, § 39-2-1(5), Ala. Code 1975. Lake Cyrus was already being developed in the City of Hoover with plans to purchase water from Birmingham when Mayor Mitchell and Charles Nevins came to Charles Givianpour's office and asked that Lake Cyrus use BWS for water instead of Birmingham. If BWS wanted to sell water, rent fire hydrants, and loop the main line at Parkwood Road and Highway 150, Lake Cyrus had to be purchased as a package, if at all. A purchase of an ongoing project is not a public work to be let for bid."
(LCDC's brief at 29.) From LCDC's standpoint, all the special financial terms and other nonstandard provisions in the 1998 water agreement may be seen as reasonable requirements to which BWS had to agree before LCDC would change its plans and use BWS instead of Birmingham Water Works as the water provider for the Lake Cyrus development. From LCDC's perspective, the entire arrangement thus constituted a "package" for BWS to accept or reject in order to acquire access to the residential customers in the Lake Cyrus development. BWS, however, as a public utility, was required to comply with the competitive bid law. That law "require[s] strict competitive bidding on contracts for public works." § 39-5-6. The 1998 water agreement obligated BWS to pay, at least in part, for the construction and installation of waterworks, i.e., water lines, valves, and hydrants, in the Lake Cyrus development. The property on which the waterworks were built was public property because LCDC had granted BWS an easement to it. Therefore, regardless of how LCDC viewed the project, the construction and installation of water-works in the Lake Cyrus development constituted a public-works project under § 39-2-1(5).
The fact that the Lake Cyrus water-works project was not a typical public-works project, inasmuch as the payments to LCDC were structured as reimbursements *Page 651 
and deferments instead of payments, does not change the fact that it was a public-works project. For example, LCDC argues that the $273,000 payment it was to receive under the 1998 water agreement was negotiated because BWS wanted LCDC to install as the main extension for the development a 16-inch water main, larger and more expensive than the 12-inch main that was otherwise planned, to allow for possible future expansion by BWS. LCDC claims the $273,000 was to defer its expense in installing the larger main. However, that $273,000 payment violates the competitive bid law. The larger 16-inch water main undoubtedly serves a public purpose in that it was constructed to benefit BWS, not LCDC. The contract for the construction of the line — the 1998 water agreement — was unilaterally awarded to LCDC without any advertisement. The fact that LCDC likely could have constructed the water main at the lowest cost anyway because it already was planning to install a smaller water main in the space is immaterial; the competitive bid law demands strict compliance.
Because the 1998 water agreement involved a public-works project (in an amount in excess of $50,000), BWS was required by § 39-2-2 to advertise for sealed bids before entering into the contract calling for it to expend public funds on the project. BWS did not do so. By way of the 1998 water agreement, BWS and LCDC effectively bypassed the bidding process entirely so as to award the contract directly to LCDC. This violated § 39-2-2 and, pursuant to § 39-2-2(c), the 1998 water agreement is accordingly "null, void, and violative of public policy." The trial court therefore erred in holding that it was a valid binding contract. Moreover, because § 39-5-6 and § 39-5-1(a) forbid a party from receiving any payment in connection with a contract awarded in violation of the competitive bid law, regardless of the party's culpability, the trial court also erred in awarding LCDC $224,979.83 for BWS's alleged breach of contract. Because the 1998 water agreement was entered into in violation of the mandatory provisions of §39-2-2, LCDC is not entitled to recover any payment for the work it performed under that contract.
 IV.
Having determined that LCDC is not entitled to any more payments under the 1998 water agreement, we now consider BWS's argument that the trial court erred by not ordering LCDC to reimburse BWS for payments that it previously made to LCDC under the 1998 water agreement. BWS argues that the law allows a party who pays money under a mistake of fact to recover that money.Russell v. Richard Thalheimer, 6 Ala.App. 73, 60 So. 411 (1912). However, the legislature has set forth a specific statutory framework by which to recover public funds expended on a public-works contract that was not properly bid. Section 39-5-3, Ala. Code 1975, provides:
 "An action shall be brought by the Attorney General or may be brought by any interested citizen, in the name and for the benefit of the awarding authority, to recover paid public funds from the contractor, its surety, or any person receiving funds under any public works contract let in violation of or contrary to this title or any other provision of law, if there is clear and convincing evidence that the contractor, its surety, or such person knew of the violation before execution of the contract. The action shall be commenced within three years of final settlement of the contract."
BWS asserted its claim that it is entitled to recovery of payments previously made to LCDC in a cross-claim filed on December 6, *Page 652 
2004. Because such a cross-claim is not "[a]n action . . . brought by the Attorney General or . . . by any interested citizen, in the name and for the benefit of the awarding authority," BWS is not entitled to the relief it seeks.
 V.
We have held that the 1998 water agreement violated §32-2-2 and is accordingly void. BWS argues, however, that this Court should sever the invalid provisions of the 1998 water agreement and enforce the remaining provisions. BWS states that the end result of such action would be a standard water-services contract, fair to both parties. LCDC argues that if the 1998 water agreement is void, it is void in its entirety.
The 1998 water agreement contains the following severance clause:
 "If any term, covenant or condition of this agreement or the application thereto to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this agreement or the application of such term, covenant or condition to other persons or circumstances shall not be affected thereby and each term, covenant and condition of this agreement shall be valid and enforceable to the fullest extent permitted by law."
BWS argues that this clause, especially when considered in light of this Court's stated policy that it will preserve as much of a contract as can survive its invalid provisions, Exparte Celtic Life Ins. Co., 834 So.2d 766, 769 (Ala. 2002), requires this Court to uphold the valid portions of the 1998 water agreement.
However, BWS fails to recognize that the 1998 water agreement does not merely contain invalid provisions; rather, the 1998 water agreement itself is void. Section 39-2-2(c) provides that "[a]ll contracts for public works entered into in violation of this title shall be null, void, and violative of public policy." Where the legislature has by statute declared a contract void, this Court cannot attempt to salvage it by pruning certain provisions, in spite of our general policy in favor of preserving as much of a contract as can survive its invalid provisions.
 VI.
The last remaining issue relates to ownership of the waterlines that are currently in place in the Lake Cyrus development. The 1998 water agreement contained a purchase option purporting to allow LCDC to repurchase all the waterlines previously tendered to BWS if it elected to do so. BWS has asked this Court to declare BWS the owner of those waterlines. Because we have held that the 1998 water agreement is void pursuant to §39-2-2(c), LCDC does not hold a valid option to repurchase the waterlines previously tendered to BWS pursuant to the 1998 water agreement; those lines are thus the property of BWS. However, all lines that LCDC has not yet tendered to BWS remain the property of LCDC. LCDC may hereafter elect to tender those lines to BWS; however, because we have held that the 1998 water agreement is void, LCDC is under no legal obligation to do so.
 VII.
The 1998 water agreement obligated BWS to use public funds to pay for the construction of waterworks inside the Lake Cyrus development; therefore, it was, pursuant to statute, a public-works project. Because it involved an amount in excess of $50,000, BWS was required by § 39-2-2 to advertise for sealed bids for the project; it did not do so. Instead, BWS awarded the contract to LCDC without advertising or soliciting bids. In doing *Page 653 
so, BWS violated § 39-2-2, and the 1998 water agreement is therefore void. Based on this holding, it is unnecessary for this Court to consider BWS's argument that Mayor Mitchell was not authorized to enter into the 1998 water agreement.
For these reasons, the trial court erred by entering a judgment in favor of LCDC and ordering BWS to pay LCDC $224,979.83. The judgment of the trial court is accordingly reversed, and this matter is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, LYONS, HARWOOD, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
[1] Bessemer Utilities includes BWS and the Bessemer Electric Service. Section 11-43D-14, Ala. Code 1975, provides that the mayor of Bessemer "shall be the chief executive officer, and shall have general supervision and control of all other officers, employees and affairs of the city, which shall include the management of the public utilities. . . ."
[2] Lake Cyrus is located in Hoover on approximately 600 acres adjacent to the Bessemer city limits. There are approximately 700 houses in the Lake Cyrus development.
[3] On March 14, 2005, the trial court ordered BWS to pay immediately the $224,979.83 specified in the trial court's March 8, 2005, order. On March 15, 2005, BWS requested a stay pursuant to Rule 62(a), Ala. R. Civ. P.; however, the trial court denied its request. Accordingly, BWS deposited $224,979.83 with the clerk of the circuit court that same day. On March 16, 2005, the trial court ordered those funds to be disbursed to LCDC. Alter filing its appeal, BWS moved this Court to stay disbursement of the funds pursuant to Rule 8(b), Ala. R.App. P. This Court granted BWS's motion and, on March 23, 2005, ordered LCDC to restore the $224,979.83 to the clerk of the circuit court no later than March 30, 2005. Because LCDC had already spent the money, the clerk of the circuit court accepted a property bond in lieu of cash.
[4] We note that the State has filed an amicus curiae brief generally supporting BWS's arguments and making the additional argument that the favored treatment LCDC received by virtue of the 1998 water agreement violates a public utility's duty not to discriminate among its ratepayers. However, although BWS may have raised that argument below, it has not advanced that argument on appeal, and this Court cannot, therefore, consider it now. See Lloyd Noland Hosp. v. Durham,906 So.2d 157, 174 (Ala. 2005) (stating that to the extent an amicus curiae advances different arguments from the actual parties to the suit, those arguments cannot be considered).