BOLIN, Justice.[1]
Lake Cyrus Development Company, Inc. (“LCDC”), appeals from the trial court’s denial of its motion to alter, amend, or vacate a judgment in favor of Bessemer Water Service (“BWS”) or, in the alternative, its motion for a new trial. We reverse and remand.

I. Facts and Procedural History

This case involves a dispute between BWS and LCDC over a contract referred to as the “1998 water agreement.” In Bessemer Water Service v. Lake Cyrus Development Co., 959 So.2d 643 (Ala.2006)(“Bessemer I”), this Court determined that the 1998 water agreement was entered into in violation of § 39-2-2, Ala.Code 1975, which mandates that all public-works contracts in excess of $50,000 be advertised for sealed bids. The relevant facts and much of the procedural history of this appeal are set forth in Bessemer I:
“The 1998 water agreement was entered into on April 30, 1998. The contract was signed by the then mayor of Bessemer, Quitman Mitchell, who by statute also served as the manager of Bessemer Utilities, and by Charles Giv-ianpour, the president of LCDC. It was the product of two months of negotiations that began when Mayor Mitchell and Charles Nivens, operations manager for Bessemer Utilities, approached Giv-ianpour and asked him to use BWS, instead of Birmingham Water Works, as the provider of water to the new Lake Cyrus residential development in Hoover. BWS was interested in providing water to Lake Cyrus not only to increase its customer base, but also to further its reach. Toward that end, BWS expressly negotiated for LCDC to increase the size of the main water line within the development (running from Highway 150 to Parkwood Road) from a 12-inch line to a 16-inch line to allow for future expansion.
“The 1998 water agreement obligated BWS
“ ‘to provide potable water to all residential, industrial and commercial areas within the [Lake Cyrus] development at the same rates and upon the same terms and conditions (as modified by the terms and provisions of this agreement) as BWS provides water service to all other residential, industrial and commercial customers, respectively, of BWS.’
“(Emphasis added.) The terms and provisions of the 1998 water agreement had *774 been modified; they were not the terms and provisions of the typical BWS water-services contract. Nivens and Terry Hinton, water-distribution superintendent at BWS, testified that it was BWS’s standard procedure to fund the cost of a water-main extension for a residential development to the point of the entrance to the development and that the developer customarily paid all costs associated with bringing water from that point into the development, including the construction of the interior main extension, the submain, and the lateral lines. However, under the 1998 water agreement, BWS agreed to pay LCDC $273,000 as ‘a partial deferment’ of the costs LCDC incurred in installing the interior 16-inch main extension, the sub-mains, and the associated water valves. Moreover, BWS agreed to reimburse LCDC on a monthly basis for all costs and expenses LCDC incurred in installing the lateral water lines within the development.
“It was also standard BWS practice to charge a ‘tap fee’ to each new customer that requested water service. The tap fee was used to offset the cost of extending the water main to the entrance of a new development and the cost of maintaining the water lines in the development after the lines were installed and tendered by the developer for BWS’s acceptance. However, the 1998 water agreement required BWS to remit to LCDC, on a monthly basis, 100% of the tap fees collected in the development.
“Aside from the provisions mandating a $273,000 payment to LCDC, the reimbursement of LCDC’s lateral-line construction costs, and the transmittal to LCDC of 100% of the collected tap fees, BWS also identified the following requirements in the 1998 water agreement as deviating from the terms and conditions of its standard water-services contract: 1) BWS was to provide and install all fire hydrants; 2) LCDC was to retain an option to repurchase all of the waterworks in the development after they were tendered to BWS; 3) BWS was required to keep the contents of the 1998 water agreement confidential; and 4) all late payments by BWS accrued interest at the rate of 18%.
“In 2002, Edward May was elected mayor of Bessemer. May replaced Mayor Mitchell and began his term on October 7, 2002. Mayor May initially continued to sign the reimbursement checks being sent to LCDC under the 1998 water agreement. However, in approximately May 2004, after reviewing a copy of the contract, Mayor May began to doubt the legality of the 1998 water agreement. After consulting with the City’s attorney, Mayor May sent LCDC a letter, dated August 9, 2004, informing it of the City’s position that the 1998 water agreement" was void and requesting that legal counsel for the City and for LCDC meet and discuss the options.
“The relationship between LCDC and BWS rapidly disintegrated. Because BWS would not pay LCDC $202,990 in reimbursements LCDC was claiming under the 1998 water agreement for finishing the interior 16-inch water-main extension through the back of the subdivision to complete the connection with the main BWS line at Parkwood Road, LCDC refused to complete the work. BWS was anxious to have the extension completed because the connection at Parkwood Road would ‘loop’ the system. In response, BWS delayed approving water lines connecting the remaining sector of the Lake Cyrus development, causing delays in residential construction.
“On December 6, 2004, BWS filed its cross-claim seeking, among other relief, relief from the allegedly invalid provisions in the 1998 water agreement that *775 required it: 1) to remit to LCDC $71,540, the outstanding balance of the $273,000 partial-deferment payment; 2) to further reimburse LCDC for costs and expenses associated with constructing lateral lines; 3) to turn over to LCDC 100% of the tap fees that were collected in the development; 4) to sell LCDC all the water lines in the development if LCDC elected to exercise the purchase option; and 5) to keep the terms of the 1998 water agreement confidential. BWS also asked the trial court to enforce the valid portions of the 1998 water agreement so as to allow BWS to continue to provide water to the Lake Cyrus development. Finally, BWS asked the trial court to determine if it could recover any of the funds previously paid to LCDC under the 1998 water agreement and to declare that BWS was the owner of all of the waterworks within the Lake Cyrus development that had previously been tendered by LCDC and accepted by BWS.
“LCDC thereafter filed a ‘motion for emergency expedited and injunctive relief,’ asking the trial court to order BWS to supply water to the final sector of the Lake Cyrus development as promised and to pay LCDC the money LCDC was claiming under the 1998 water agreement. LCDC further asked the court to enjoin BWS from future breaches of the contract.
“The trial court held a bench trial on all pending matters in the case from February 28, 2005, through March 3, 2005. On March 7, 2005, the trial court entered an order finding the entire 1998 water agreement to be valid and entering a judgment in favor of LCDC. On March 8, 2005, the trial court entered an amended order, ordering BWS to pay LCDC $224,979.83 in damages. BWS appeals.”
959 So.2d at 646-48 (emphasis in original; footnotes omitted).
In jBessemer I, this Court concluded that the trial court had exceeded its discretion in holding that the 1998 water agreement was a valid binding contract and in awarding LCDC $224,979.83 because, we held, the agreement was entered into violation of § 39-2-2 and was therefore void:
“Because the 1998 water agreement involved a public-works project (in an amount in excess of $50,000), BWS was required by § 39-2-2 to advertise for sealed bids before entering into the contract calling for it to expend public funds on the project. BWS did not do so. By way of the 1998 water agreement, BWS and LCDC effectively bypassed the bidding process entirely so as to award the contract directly to LCDC. This violated § 39-2-2 and, pursuant to § 39-2-2(c), the 1998 water agreement is accordingly ‘null, void, and violative of public policy.’ The trial court therefore erred in holding that it was a valid binding contract. Moreover, because § 39-5-6 and § 39-5-l(a)[, Ala.Code 1975,] forbid a party from receiving any payment in connection with a contract awarded in violation of the competitive bid law, regardless of the party’s culpability, the trial court also erred in awarding LCDC $224,979.83 for BWS’s alleged breach of contract. Because the 1998 water agreement was entered into in violation of the mandatory provisions of § 39-2-2, LCDC is not entitled to recover any payment for the work it performed under that contract.”
959 So.2d at 651. In addition to holding that LCDC was not entitled to recover any payments for the work it had performed under the 1998 water agreement, we also held (1) that any invalid provisions of the 1998 water agreement were not subject to severance; (2) that because LCDC did not hold a valid option to repurchase the waterlines previously tendered to BWS under the 1998 water agreement, those lines *776 were the property of BWS and the lines that LCDC had not yet tendered to BWS remained the property of LCDC; and (8) that any action to recover payments made by BWS to LCDC under the 1998 water agreement could be brought only by the attorney general or any other interested person for the benefit of BWS, § 39-5-3, Ala.Code 1975. For the foregoing reasons, this Court reversed the judgment of the trial court and remanded the cause for proceedings consistent with this Court’s opinion.

II. Proceedings on Remand

On December 18, 2006, the trial court entered an order setting aside its March 8, 2005, judgment in favor of LCDC and awarding LCDC $224,979.83. On January 10, 2007, then Attorney General Troy King[2] intervened, pursuant to § 39-5-3, on BWS’s behalf and filed a complaint against LCDC seeking to recover the payments BWS had made to LCDC under the 1998 water agreement. On August 27, 2007, Attorney General King, on behalf of BWS, filed (1) a motion for a partial judgment in the amount of $224,-979.83[3] and (2) a motion for a summary judgment, asserting that BWS was entitled to recover $1,093,727.96 — the amount BWS claimed it had paid LCDC under the 1998 water agreement. The trial court granted BWS’s motion for a partial judgment but denied its motion for a summary judgment. The trial court thereafter conducted a hearing for the purpose of determining (1) whether, pursuant to § 39-5-3, Attorney General King was entitled to recover on behalf of BWS the payments BWS had made under the 1998 water agreement and (2) which waterlines in the Lake Cyrus development had been tendered to BWS.
On November 13, 2009, the trial court entered a judgment in favor of Attorney General King for the benefit of BWS:
“(1) That judgment is rendered in favor of the Intervenor Troy King, as Attorney General of the State of Alabama for the benefit of [BWS] and against [LCDC], in the amount of $1,093,727.96.
“(2) That all water lines in question wherein [LCDC] or a customer has requested water services from [BWS] and the lines are interconnected with the public water system and are devoted to public services have been ‘tendered’ by [LCDC] to [BWS] and are the property of [BWS].”
LCDC thereafter filed a postjudgment motion requesting that the trial court alter, amend, or vacate its judgment or, in the alternative, that it order a new trial. The trial court denied the motion. LCDC appealed.

III. Standard of Review

“Our standard of review for rulings on postjudgment motions is well settled:
“ ‘In general, whether to grant or to deny a posttrial motion is within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal unless by its ruling the court abused some legal right and the record plainly shows *777 that the trial court erred. See Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38 (Ala.1990).’ ”
Hitt v. State of Alabama Pers. Bd., 873 So.2d 1080,1085 (Ala.2003) (quoting Flagstar Enters., Inc. v. Foster, 779 So.2d 1220, 1221 (Ala.2000)).

IV. Discussion

1. Section 39-5-3, Ala.Code 1975

The first issue presented by LCDC is whether the trial court’s judgment in favor of Attorney General King, acting on behalf of BWS, was supported by clear and convincing evidence that Charles Givianp-our, the president of LCDC, knew before the 1998 water agreement was executed that the agreement was being entered into in violation of § 39-2-2.
Section 39-5-3 provides:
“An action shall be brought by the Attorney General or may be brought by any interested citizen, in the name and for the benefit of the awarding authority, to recover paid public funds from the contractor, its surety, or any person receiving funds under any public works contract let in violation of or contrary to this title or any other provision of law, if there is clear and convincing evidence that the contractor, its surety, or such person knew of the violation before execution of the contract. The action shall be commenced within three years of final settlement of the contract.”
(Emphasis added.)
As previously noted, Attorney General King intervened in this case on behalf of BWS to recover payments BWS had made to LCDC under the 1998 water agreement. It is undisputed (1) that Attorney General King was an appropriate party to bring an action on behalf of BWS under § 39-5-3, (2) that the 1998 water agreement constituted a contract for public works as determined in Bessemer I, and (3) that BWS had made payments to LCDC under the 1998 water agreement.[4] The only issue left for our determination is whether the record demonstrates clear and convincing evidence that Givianpour knew before the 1998 water agreement was executed that the agreement was being entered into in violation of § 39-2-2. The evidence is this case was presented to the trial court ore tenus.
“ ‘[W]hen evidence is presented ore tenus in a nonjury case, a judgment based on that ore tenus evidence will be presumed correct and will not be disturbed on appeal unless it is plainly and palpably wrong or against the great weight of the evidence. Eagerton v. Second Econ. Dev. Coop. Dist. of Lowndes County, 909 So.2d 783, 788 (Ala.2004). Nevertheless, this rule is not applicable where the evidence is undisputed or where the material facts are established by undisputed evidence. Salter v. Hamiter, 887 So.2d 230, 233-34 (Ala.2004). Additionally, when the trial court “improperly applies the law to the facts, the presumption of correctness otherwise applicable to the trial court’s judgment has no effect.” Ex parte Bd. of Zoning Adjustment of Mobile, 636 So.2d 415, 418 (Ala.1994).’ ”
Bessemer I, 959 So.2d at 648 (quoting Hartford Cas. Ins. Co. v. Merchants & Farmers Bank, 928 So.2d 1006, 1009 (Ala.2005)).
As stated in Bessemer I, the 1998 water agreement was the product of two months of negotiations that began when Quitman Mitchell, then mayor of the City of Bes *778 semer, and Charles Nivens, operations manager for Bessemer Utilities, approached Givianpour and asked him to use BWS instead of Birmingham Water Works as the provider of water services to the Lake Cyrus development. The 1998 water agreement was signed by both Mayor Mitchell on behalf of the City of Bessemer and Givianpour as president of LCDC; both parties were represented by attorneys.
The only witnesses who testified at the hearing were Givianpour; Nivens; Fred Hinton, a supervisor at BWS; and Terry Edwards, a supervisor at BWS. Givianpour testified that he had been in the “land construction development” and “construction” business for over 20 years and that, during that time, he had never been involved with a government contract. Giv-ianpour testified that Steven R. Monk of Bradley & Arant, LLC, had represented him in negotiating the 1998 water agreement. Givianpour testified that Monk specifically told him that the City of Bessemer had represented and certified that it had the right to enter into the agreement, and he stated that, according to Monk, the contract was valid. It is BWS’s position that Monk told Givianpour that the 1998 water agreement violated the competitive-bid law, i.e., § 39-2-2, but that Givianpour chose to enter into the agreement in hopes that that would not present a problem. BWS relies heavily on the fact that Monk did not testify regarding the legality of the 1998 water agreement, that Givianpour had failed to bring a legal-malpractice action against Monk, and that Givianpour had continued to use Monk as an attorney for other matters even after Attorney General King had intervened in the case.
Givianpour testified as follows:
“Q. Let me ask you this: Do you recall finding out — do you recall when you found out that you had been — that [LCDC] had been sued?
“A. The only thing I know was that I heard that the mayor goes to the council and tell[s] the council that [the 1998 water agreement was going to] court [to] get [the] judge’s opinion on that contract, that whether that contract is good by — by the mayor’s signature or [should the 1998 water agreement have the] city council’s signature on it. That’s what I was told that this whole thing was about.
[[Image here]]
“A. And then it evolved from that.
“Q. But when it evolved, what did you do? Did you contact anybody?
[[Image here]]
“A. I talked to Steve Monk, and, you know, he is not a litigator, so I had to get someone that, you know, can [represent me in court]. He doesn’t go to court and litigate.
[[Image here]]
“A. I believe when originally this [came] up there was no question of bid laws. It was question of whether [the] council had to sign or not.
[[Image here]]
“A. I [had a] conversation with [Steve Monk], and over and over and over again he [told] me that this [1998 water agreement] is good even with [the Supreme Court] not calling it [in Bessemer I ]. He stated that [the Supreme Court] was misled; they made their own decision; and we’re still good....
“Q. And nobody has ever told you that you would have a malpractice suit?
[[Image here]]
“A. ... There is no possible way that [BWS] could have bid this project. And that’s the technicality that everybody is hanging their hat on.
[[Image here]]
“This project could have never been bid....
*779 “But the only thing was that it was— they came to me as a favor to them. This was not a profit center. No one made any money on it. No one was going to make any money on it.
“The only thing here was, they ask me to upgrade this pipe that I was putting in the ground from 12-inch to 16-inch. And they said that we calculated our cost from U.S. Pipe.... They paid no labor. I even subsidized the taxes.
“So how could they bid anything to anyone out there that whoever is doing it is going to lose money on it? There was no profit here.... It was a favor that I did for Bessemer ..., and here I’m getting burned because of it.
“Since then, we lost most of our net worth. I lost my retirement money on it. I lost some of my net worth that I worked thirty, forty years. My kids going to college? Now [there is a threat] that they [will] not be able to register next time. And all of that happened just because of a technicality.
[[Image here]]
“Q. And so you’re telling me that [Steve Monk] never once told you that this is in violation of the bid law; I’ll set up this contract for you, and we’ll just see how it goes?
“A. No. He still thinks that, you know, everything was done right and we got caught in some kind of technicality.
“But, no, I think that [Steve Monk] is a very honorable man, and I back him up a hundred percent.
[[Image here]]
“Q. Was the City of Bessemer represented by any attorney?
“A. Calvin Biggers.
“Q. Did you rely on this [1998 water agreement]?
“A. We borrowed money on it.
“Q. Before you entered into this agreement, did anyone ever tell you or did you have any knowledge that the contract should have been bid out?
“A. No. It could not have been bid out. It’s humanly not possible.”
There was no other evidence or testimony presented to dispute Givianpour’s testimony that he had no knowledge before the 1998 water agreement was executed that the agreement was being entered into in violation of § 39-2-2. Fred Hinton testified primarily regarding the repairs BWS had made in the Lake Cyrus development from 1998 through 2004 and the costs involved in making those repairs. Terry Edwards testified primarily regarding the amount of work BWS had performed in the Lake Cyrus development between 1998 and 2006. Charles Nivens testified about the specific payments alleged to be owed by LCDC under the 1998 water agreement, about the procedure BWS customarily used to inherit and/or receive ownership of waterlines, about the waterlines LCDC had tendered to BWS, and about the fact that BWS had worked on the waterlines within the Lake Cyrus development without procuring any easements. The testimony provided from Edwards, Hinton, and Nivens was unrelated to the issue whether Givianpour had knowledge before its execution that the 1998 water agreement violated § 39-2-2.
Section 39-5-3 requires a showing by “clear and convincing evidence” that Givianpour knew before its execution that the 1998 water agreement violated § 39-2-2. Clear and convincing evidence is defined as follows:
“Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a *780 preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
Ala.Code 1975, § 6-11-20(4) (emphasis added).
The record does not support a showing of any evidence, much less clear and convincing evidence, that Givianpour had knowledge before its execution that the 1998 water agreement was in violation of § 39-2-2. Accordingly, BWS is not entitled, pursuant to § 39-5-3, to recover any money it paid to LCDC under the agreement. When the trial court improperly applies the law to the facts, the presumption of correctness otherwise applicable to the trial court’s judgment is not applicable. Bessemer I, 959 So.2d at 648. Because the trial court improperly applied the law to the facts of this case, its judgment awarding BWS $1,093,727.96 in damages is due to be reversed.

2. Ownership of the Waterlines

In Bessemer I, this Court addressed the ownership of the waterlines as follows:
“The last remaining issue relates to ownership of the waterlines that are currently in place in the Lake Cyrus development. The 1998 water agreement contained a purchase option purporting to allow LCDC to repurchase all the waterlines previously tendered to BWS [in the event of a default by BWS] if it elected to do so. BWS has asked this Court to declare BWS the owner of those waterlines. Because we have held that the 1998 water agreement is void pursuant to § 39-2-2(c), LCDC does not hold a valid option to repurchase the waterlines previously tendered to BWS pursuant to the 1998 water agreement; those lines are thus the property of BWS. However, all lines that LCDC has not yet tendered to BWS remain the property of LCDC. LCDC may hereafter elect to tender those lines to BWS; however, because we have held that the 1998 water agreement is void, LCDC is under no legal obligation to do so.”
959 So.2d at 652 (emphasis added).
Bessemer I addressed ownership of the waterlines that were “currently” in place at the Lake Cyrus development. Bessemer I specifically held that because LCDC did not hold a valid option to repurchase the waterlines “previously” tendered to BWS under the 1998 water agreement, those lines remained the property of BWS and all lines LCDC had not yet tendered to BWS remained the property of LCDC. On remand, the trial court held a hearing to determine, among other things, which waterlines had actually been tendered to BWS. In his opening statement to the trial court, BWS’s attorney stated:
“The Supreme Court stated that those lines that had already been tendered to Bessemer Water Services belong to Bessemer Water Services and that those lines that had not been tendered to Bessemer Water Services belong to the Lake Cyrus Development Company.
“There’s yet to be a determination as to what lines have been tendered.... ”
In Bessemer I, however, this Court did not address how a “tender” occurred in the absence of a valid written agreement. Therefore, before the trial court could properly make a determination regarding which waterlines had actually been tendered to BWS, it had to determine how a tender could be accomplished. Charles Nivens, operations manager for Bessemer Utilities, testified as follows:
“Q. And is there something that happens when someone develops a subdivision, as far as if they install the lines, what’s the procedure for Bessemer receiving those waterlines?
“A. They normally pressure-test [the lines] to our satisfaction and disinfect the lines to our satisfaction. And then *781 we, as utilities, inherit the lines based, on a main-extension agreement.
“Q. Were the lines in Lake Cyrus Development, had they been pressure-tested, and any other kind of requirements that Bessemer requires, have all those requirements been met?
“A. Yes.
[[Image here]]
“... Other than sections 16A and 16B inside the Lake Cyrus Development Company [sic], have any lines ever been tendered as far as the main-extension lateral agreement? Has it ever been signed by [LCDC] and transferring those lines to [BWS]?
“A. Not that I’m aware of.
“Q. So it’s your testimony that those lines have never been transferred to [BWS]?
“A. The lines were disinfected, pressure-tested and signed off by our — by our lab. And because of past practice and customs and agreements that we’ve had over numerous years, that was when [BWS] took over responsibility for those lines and made the appropriate taps on those lines.
“Q. To the best of your knowledge, had [BWS] ever entered [into] an agreement with anyone like they did [LCDC]?
“A. No, that was the first.
[[Image here]]
“Q. Is that your common pattern and practice, is to have a development complete a document that states they’re transferring the lines to [BWS]?
“A. [Nivens:] Again, we have what we call a main-extension agreement. It’s where the contractor submits plans to us for their subdivision.
“It’s reviewed by [BWS] ....
“It’s approved and signed off on and then — and sent back to the individual.
“And in that document — the main-extension agreement states that those lines would become property of [BWS].
[[Image here]]
“Q. You were asked earlier if you — if the Lake Cyrus Development had any— I’m sorry, if [BWS] had easements over those waterlines in the Lake Cyrus Development Company [sic], and you said no. Why.did you say no?
[[Image here]]
“A. I’ve requested ... for years to get mapping of Lake Cyrus. And in order to get easements, you have to have the mapping so that easements can be recorded with the court system.
“Q. Are you aware that in the [1998 water agreement] there was a provision there for easements?
“A. Yes.
“Q. And is it your understanding that there was a question of whether or not there was an easement within the development after this Supreme Court opinion came out?
“A. It’s my understanding that the minute that we accepted the lines as being pressure-tested and disinfected and approved by our environmental group that the lines were ours based on the contract.”
(Emphasis added.)
To reiterate, Nivens testified regarding the procedure BWS customarily used to inherit waterlines from a developer. Specifically, Nivens testified that once waterlines are pressure-tested and disinfected to BWS’s satisfaction, BWS inherits the lines based on a main-extension agreement. Nivens also testified that, in this case, it was his understanding “that the minute that we accepted the lines as being pressure-tested and disinfected and approved by our environmental group that the lines were ours based on the contract.” The contract to which Nivens refers is the 1998 water agreement, which this Court in Bessemer I held was void. Nivens further *782 acknowledged that he was unaware of any other waterlines, other than those lines in sections 16A and 16B of the Lake Cyrus development that had been tendered to BWS pursuant to a main-extension agreement. Givianpour also testified that in 2008 he signed a main-extension agreement with the City of Bessemer for sections 16A and 16B and that the agreement was presented to him by Aaron Killings, the attorney for BWS.
Despite the undisputed evidence adduced at the hearing concerning BWS’s customary pattern and practice of receiving tender of waterlines from a developer, the trial court held, without citation to authority or any basis therefor:
“(2) [t]hat all waterlines in question wherein the developer or a customer has requested water services from [BWS] and the lines are interconnected with the public water system and are devoted to public services have been ‘tendered’ by [LCDC] to [BWS] and are the property of [BWS].”
On appeal, LCDC argues, in part, that the trial court’s judgment is unsupported by the evidence. We agree. As previously stated, in order to determine which waterlines had been tendered, the trial court was tasked with determining how a “tender” of those lines is accomplished. The trial court’s judgment regarding how a tender is accomplished is both ambiguous and unsupported by the evidence. Specifically, the judgment is silent regarding the procedure BWS customarily uses to inherit waterlines from a developer; the judgment neither references a main-extension agreement nor excludes it. Moreover, the judgment, among other things, refers to waterlines being “devoted to public services.” There was no testimony presented during the hearing regarding the devotion of waterlines to “public services,” nor is there any record of such argument being made to the trial court. The trial court’s judgment neither defines the phrase “devoted to public services” nor cites any authority for the meaning of the phrase. There is simply nothing in the record to support the trial court’s finding that a tender is accomplished “once the developer or a customer has requested water services” and “the lines are interconnected with the public water system” and “are devoted to public services.”[5] Moreover, the trial court’s judgment is silent regarding which waterlines had actually been tendered; the undisputed evidence was that only those waterlines in sections 16A and 16B had been tendered.
We hold, under the undisputed facts of this case, that a “tender” occurs between LCDC and BWS when LCDC signs a main-extension agreement after BWS’s testing protocol. The undisputed evidence is that LCDC signed a main-extension agreement for only those waterlines in sections 16A and 16B of the Lake Cyrus development. This Court’s holding in Bessemer I that LCDC may elect to “tender” additional lines to BWS, but that it is under no obligation to do so, remains the law of the case. 959 So.2d at 652. Additionally, in the absence of a written agreement between BWS and LCDC, any “tender” of waterlines to BWS post-Bessemer I, under the evidence submitted to the trial court, should have been pursuant to a signed main-extension agreement in accor *783 dance with BWS’s customary practice of inheriting waterlines from a developer. Because the trial court’s judgment regarding the manner for a “tender” not only is ambiguous, but also is unsupported by the evidence, its judgment concerning ownership of the waterlines is due to be reversed. See Scott v. McGriff, 222 Ala. 344, 346,132 So. 177, 179 (1930) (“The rule that the finding and conclusion of the trial court on testimony given ore tenus will be accorded the weight of the verdict of a jury, and will not be disturbed unless contrary to the great weight of the evidence, is without application, where the evidence is without dispute and but one conclusion can be drawn from it.”).

V Conclusion

The trial court’s finding that Givianpour, LCDC’s president, had knowledge before the 1998 water agreement was executed that the agreement was in violation of the competitive-bid law, § 39-2-2, Ala. Code 1975, was not supported by clear and convincing evidence. Further, the trial court’s finding regarding how a “tender” of waterlines occurred in the absence of a valid written agreement was not supported by the evidence. Accordingly, the trial court’s denial of LCDC’s postjudgment motion seeking relief from the November 13, 2009, judgment is due to be reversed and the case remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
STUART, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
MURDOCK, J., concurs specially.
MOORE, C.J., and PARKER, J., concur in the result.

. This case was mistakenly placed on this Court’s administrative docket in September 2011. It was not assigned to Justice Bolin until October 31, 2013. We regret the delay in the issuance of a decision in this appeal.

. While this case was pending on appeal, Luther Strange succeeded Troy King as attorney general. By virtue of Rule 43(b), Ala. R.App. P., Attorney General Strange was automatically substituted as a party.

. The $224,979.83 represents the amount the trial court awarded LCDC in its March 8, 2005, order. BWS deposited the money with the clerk of the circuit court, and the money was thereafter disbursed to LCDC. This Court ordered LCDC to restore the money to the clerk of the circuit court. However, LCDC had already spent the money, so the clerk of the circuit court accepted a property bond in lieu of cash.

. The parties do not address the timeliness of the action brought by the attorney general, i.e., whether the action was “commenced within three years of final settlement of the contract.”

. We note that it appears from the transcript that, following the hearing, the trial judge instructed the parties to "brief the matters.” The post-hearing briefs are not included in the record. It appears, however, that, based on the terminology used by BWS in its brief on appeal, the trial court took BWS's position in fashioning its judgment. Because the testimony regarding the procedure customarily used by BWS for inheriting waterlines was undisputed, our review of the evidence is de novo and the trial court’s judgment is not accorded any presumption of correctness. Bessemer I.