Rel: December 5, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

————————————————

### SC-2025-0376

————————————————

**Pinpoint Locating, Inc.**

**v.**

**The Water Works and Gas Board of the City of Red Bay**

**Appeal from Franklin Circuit Court**
**(CV-23-900076)**

SELLERS, Justice.

Pinpoint Locating, Inc., appeals from a summary judgment entered by the Franklin Circuit Court ("the trial court") in favor of the Water Works and Gas Board of the City of Red Bay ("the Board"). We reverse.

## I. Facts and Procedural History

In 2021, the Board obtained an approximately $4.4 million loan for the purpose of replacing and extending gas lines in and around the City of Red Bay ("the project"). The project consisted of four phases: The Red Bay Cast Iron Replacement Project ("the Cast Iron Replacement Phase"); the Red Bay Expansion Project Phase One ("Phase I"); the Red Bay Expansion Project Phase Two ("Phase II"); and the Red Bay Expansion Project Phase Three ("Phase III"). The Board contracted with Magnolia River Services, Inc., an engineering firm, to design and manage the project. Among other things, Magnolia prepared the specifications for each phase of the project; however, it had no involvement in the advertisement for sealed bids for the project. Pinpoint was the only contractor to submit a bid for each phase of the project; the Board accepted those bids, and the parties executed four separate contracts for the work to be performed on the project. Pinpoint commenced work on each phase of the project in September 2021, but it ceased all work in October 2022 after the Board stopped making payments under the contracts. By a letter dated May 6, 2023, the Board's attorney advised Pinpoint's attorney that, because the advertisement for sealed bids had

not been made in accordance with the version of § 39-2-2, Ala. Code 1975, in effect at the time those advertisements were made ("former § 39-2-2"), it did not appear that the Board could legally make any further payments under the contracts.[1] At the time the Board ceased making payments under the contracts, the Board had paid Pinpoint a total of $2,822.245, but it still owed $811,300.52 for work completed.[2]

In June 2023, Pinpoint commenced an action against the Board, asserting claims of breach of contract, among other claims. The Board

---

[1]It appears from the May 6, 2023, letter from the Board's attorney to Pinpoint's attorney that the Board may have believed that Magnolia was responsible for the advertisement for sealed bids for each phase of the project. However, Magnolia submitted an affidavit indicating that the advertisement for sealed bids was not within the scope of its contract with the Board. According to Pinpoint, the Board ceased making payments under the contracts after the Alabama Department of Transportation mandated a change order that added nearly $1 million in estimated charges to the project. Thus, Pinpoint claims, the Board did not have enough money left in its budget to complete the project and, therefore, used the defective advertising as an excuse for ceasing payment under the contracts.

[2]According to Pinpoint, two weeks before the Board ceased making payments under the contracts, Magnolia certified that Pinpoint had completed the following: 100% of the installed mains for the Cast Iron Replacement Phase; 100% of Phase III; 72% of Phase II; and 62% of Phase I. Thus, Pinpoint says, through its work on all the phases, it had dug, bored, and laid 138,625 feet of new gas lines for the Board and its ratepayers, i.e., over 26 miles of new gas lines.

filed a motion for a summary judgment pursuant to Rule 56, Ala. R. Civ. P., arguing that the contracts were void because, it claimed, the advertisement for sealed bids did not strictly comply with the mandates of former §39-2-2(a). Following a hearing, the trial court entered a summary judgment in favor of the Board. Pinpoint filed a postjudgment motion to alter, amend, or vacate the judgment, which the trial court denied. This appeal followed.

## II.  Standard of Review

"This Court reviews a summary judgment de novo, and we use the same standard used by the trial court to determine whether the evidence presented to the trial court presents a genuine issue of material fact. Rule 56(c), Ala. R. Civ. P.; Nettles v. Pettway, 306 So. 3d 873 (Ala. 2020). The movant for a summary judgment has the initial burden of producing evidence indicating that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Once the movant produces evidence establishing a right to a summary judgment, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. We consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. Id."

Sykes v. Majestic Mississippi, LLC, 402 So. 3d 203, 207-08 (Ala. 2024).

## III. Discussion

### A.  Advertisement Requirements for Public-Works Contracts

Title 39, Ala. Code 1975, governs contracts for public works. At the time the advertisements for sealed bids were made in this case, former § 39-2-2 provided, in pertinent part:

"(a) Before entering into any contract for a public works involving an amount in excess of fifty thousand dollars ($50,000), the awarding authority shall advertise for sealed bids. ... If the awarding authority is a municipality, or an instrumentality thereof, it shall advertise for sealed bids at least once in a newspaper of general circulation published in the municipality where the awarding authority is located. If no newspaper is published in the municipality, the awarding authority shall advertise by posting notice thereof on a bulletin board maintained outside the purchasing office and in any other manner and for the length of time as may be determined. In addition to bulletin board notice, sealed bids shall also be solicited by sending notice by mail to all persons who have filed a request in writing with the official designated by the awarding authority that they be listed for solicitation on bids for the public works contracted indicated in the request. ... [F]or all public works contracts involving an estimated amount in excess of five hundred thousand dollars ($500,000), awarding authorities shall also advertise for sealed bids at least once in three newspapers of general circulation throughout the state.

"....

"(c) All contracts for public works entered into in violation of this title shall be null, void, and violative of public policy. Anyone who willfully violates this article concerning public works shall be guilty of a Class C felony."[3]

_____

[3]The legislature amended former § 39-2-2 twice since the advertisements for sealed bids were made in this case: once effective July 1, 2021, and once effective September 1, 2021; the 2023 amendment

(Emphasis added.) See also § 39-5-1(a), Ala. Code 1975 ("No civil action shall be brought or maintained by a contractor in any court in this state to require any awarding authority to pay out public funds for work and labor done, for materials supplied, or on any account connected with performance of a contract for public works, if the contract was let or executed in violation of or contrary to this title or any provision of law."). Section 39-5-1(b) provides, in pertinent part, that "[t]he awarding authority shall, prior to the execution of final contracts and bonds, certify that the contract to be awarded is let in compliance with this title and all other applicable provisions of law." See also § 39-5-5, Ala. Code 1975 (providing that "[a]ll persons or parties entering into contracts or agreements with an awarding authority for the construction of a public work shall be conclusively presumed to have notice of the provisions of this title").

Finally, § 39-5-6, Ala. Code 1975, provides:

> "The provisions of this title are mandatory, and shall be construed to require strict competitive bidding on contracts for public works. The courts shall not invoke or apply any

___

amended the statute to, among other things, remove the requirement that sealed bids in excess of $500,000 be advertised in three newspapers of general circulation throughout the state.

6

principle of quantum meruit, estoppel, or any other legal or equitable principle which would allow recovery for work and labor done or materials furnished under any contract let in violation of competitive bidding requirements as prescribed by law."

In Bessemer Water Service v. Lake Cyrus Development Co., 959 So. 2d 643, 649 (Ala. 2006) ("BWS"), this Court explained the purpose behind competitive bidding of public-works projects:

"Competitive bidding by sealed bids guards against opportunities for corruption in the procurement of contracts for public-works projects. These statutes make it clear that the legislature intended to erect impregnable barriers to prevent the misuse of public funds inherent in awarding public-works contracts covered by § 39-2-2 without competitive bidding."

(Emphasis added.)

It is undisputed that the contracts at issue are public-works contracts, that the amount of each contract exceeds $500,000, and that the Board was responsible for complying with the advertisement requirements of former § 39-2-2 before awarding those contracts. It is also undisputed that, before awarding the public-works contracts, the Board was required to certify that the contracts were let in compliance with Title 39 but that it did not do so. See § 39-5-1(b). Nonetheless, Pinpoint was presumed to have notice of Title 39's provisions, including

the requirement that the Board certify that the contracts were let in compliance with Title 39. See § 39-5-5. In this case, it is undisputed that the Board did not strictly comply with the advertisement requirements of former § 39-2-2. During the proceedings below, the parties disputed whether substantial compliance with the advertisement requirements of former § 39-2-2(a) would be sufficient. The trial court entered a summary judgment in favor of the Board, presumably finding that the statute required strict compliance. Therefore, we will address the doctrine of substantial compliance to determine whether it is applicable in this case.

### B. Substantial Compliance

In Pittman v. Pittman, 419 So. 2d 1376, 1379 (Ala. 1982), this Court defined substantial compliance:

> "'Substantial compliance' may be defined as 'actual compliance in respect to substance essential to every reasonable objective,' of a [statute] giving effect to equitable principles -- equity -- in the true meaning of that word. Application of Santore, 28 Wash. App. 319, 623 P.2d 702 (1981). Substantial compliance means compliance which substantially, essentially, in the main, for the most part, satisfies the means of accomplishing the objectives sought to be effected by the [statute] and at the same time does complete equity. See North Carolina Nat'l Bank v. Burnette, 297 N.C. 524, 256 S.E.2d 388 (1979). What constitutes substantial compliance is a matter dependent upon the particular facts of each case, none ever quite a clone of any

8

other. See <u>Trussell v. Fish</u>, 202 Ark. 956, 154 S.W.2d 587 (1941)."

Thus, in determining whether there can be substantial compliance with a statute, the paramount consideration is whether the statute has been followed sufficiently so as to carry out its intent. <u>Id.</u> <u>See</u> <u>also</u> <u>Sawyer v. Sonoma Cnty.</u>, 719 F.2d 1001, 1008 (9th Cir. 1983) (noting that the doctrine of substantial compliance is an equitable doctrine designed to avoid hardship in cases in which a party has done all that can be reasonably expected).

In its motion for a summary judgment, the Board argued that the plain language of former § 39-2-2 required strict compliance. It also contended that this Court's holding in <u>BWS</u>, supra, is dispositive regarding strict compliance with the statute. In opposition to the Board's summary-judgment motion, Pinpoint argued that this Court has previously determined that there can be substantial compliance with the requirements of competitive-bid laws, that the attorney general has repeatedly issued advisory decisions opining that there can be substantial compliance with the advertisement requirements of former § 39-2-2(a), and that the facts of <u>BWS</u> are distinguishable from the facts of this case. We agree.

9

To begin, although public-works contracts are governed exclusively by Title 39, this Court has previously recognized that contracts executed pursuant to the competitive-bid laws, see § 41-16-50 et seq., Ala. Code 1975, can substantially comply with those laws. See Brown's Ferry Waste Disposal Ctr., Inc. v. Trent, 611 So. 2d 226 (1992) (holding that a contract subject to the competitive bid laws was void because it did not substantially comply with those laws); Kennedy v. City of Prichard, 484 So. 2d 432 (Ala. 1986) (holding that an exclusive contract for a wrecker service that failed to substantially comply with the competitive bid laws necessarily violated Ala. Const. 1901, Art. 1, § 22); and Owens v. Bentley, 675 So. 2d 476, 478 (Ala. Civ. App. 1996) ("After reviewing the record, we find that under the facts of the present case … the Commission and the [Baldwin County Solid Waste Authority] substantially complied with the competitive bid laws."). We also find persuasive the fact that the attorney general has issued multiple advisory opinions regarding compliance with the advertisement requirements set forth in former § 39-2-2(a) and that, in doing so, has opined that the statute's advertisement requirements can be satisfied by substantial compliance. See, e.g., Ala. Att'y Gen. Op. No. 2011-100 (Sept. 20, 2011) (opining that City of Pelham had substantially

complied with former § 39-2-2(a) despite fact that it had advertised in only one newspaper of general circulation throughout the state because the matter "was thoroughly advertised online," which included postings on various websites, bulletin boards, Dodge Reports, and publications known and routinely accessed by contractors); Ala. Att'y Gen. Op. No. 2005-136 (May 19, 2005) (opining that the Alabama Department of Transportation had substantially complied with former § 39-2-2(a) despite the fact that the department had advertised its project in only one newspaper of general circulation throughout the state because the department had utilized direct mailings, internet postings, and Dodge Reports and noting that the work was well underway before any advertising deficiency was discovered); and Ala. Att'y Gen. Op. No. 2004-018 (Oct. 31, 2003) (opining that the Town of South Vinemont had substantially complied with former § 39-2-2(a) when the town had advertised for sealed bids in 3 newspapers, had 14 companies request plans and specifications, had received 6 sealed bids, and had awarded the contract to the lowest bidder despite the fact that, after the bid was awarded, it was determined that one of the newspapers in which the advertisement had run was not, in fact, a newspaper of general

11

circulation throughout the state as required by the statute). Finally, although the Board relies on BWS in arguing that there must be strict compliance with the advertisement requirements of former § 39-2-2(a), we find that case to be factually distinguishable. In BWS, the mayor of the City of Bessemer, who by statute also served as the manager of Bessemer Utilities, which included the Bessemer Water Service ("BWS"), unilaterally awarded a public-works contract to Lake Cyrus Development Company, Inc. ("LCDC"), without any solicitation or advertisement for sealed bids. Among other things, "BWS was interested in providing water to [LCDC] not only to increase [BWS's] customer base, but also to further its reach." 959 So. 2d at 646. Moreover, the terms and provisions of the contract at issue deviated from the typical BWS water-service contract. Certain ratepayers sued BWS, alleging that BWS had misused public funds, resulting in the ratepayers paying inflated amounts for their water consumption. This Court explained that the purpose of the public-works statutes is plain: "Competitive bidding by sealed bids guards against opportunities for corruption in the procurement of contracts for public-works projects." Id. at 649. Because BWS and LCDC had effectively bypassed the bidding process entirely to

12

award the contract directly to LCDC, this Court held that the contract was null, void, and violated public policy. Here, unlike the facts of BWS, there have been no allegations by any ratepayer or party concerning the misuse of public funds. Specifically, there are no charges of corruption, improper motive, bad faith, or favoritism in awarding the contracts to Pinpoint, and no evidence suggests that the Board engaged in any questionable scheme to eliminate fair competition. See, e.g., White v. McDonald Ford Tractor Co., 287 Ala. 77, 86, 248 So. 2d 121, 129 (1971) ("The single most important requirement of the Competitive Bid Law is the good faith of the officials charged in executing the requirements of the law."). Thus, this case is a classic example of why the substantial-compliance doctrine is applicable. Accordingly, to the extent that the trial court based its summary judgment in favor of the Board on a finding that the doctrine of substantial compliance does not apply, the trial court erred.

## C. The Merits

The issue for our review is, therefore, whether Pinpoint has offered substantial evidence to indicate that the Board substantially complied with the advertisement requirements of former § 39-2-2(a). Pursuant to

former § 39-2-2(a), the Board, being an instrumentality of the City of Red Bay, was required to advertise for sealed bids at least once in a newspaper of general circulation published in Red Bay and at least once in three newspapers of general circulation throughout the state. In its motion for a summary judgment, the Board argued that a request for sealed bids for the Cast Iron Replacement Phase of the project was not advertised in any newspaper and that requests for sealed bids for Phases I, II, and III of the project were advertised only in the Red Bay News, which, the Board claimed, is not a newspaper of general circulation throughout the state. In support of its argument, the Board offered the affidavit of Cynthia Fowler, the office manager and comptroller for the Board, who stated that she was instructed to advertise only for sealed bids for Phases I, II, and III of the project. According to the Board, it is unknown why a request for sealed bids for the Cast Iron Replacement Phase was not advertised in any newspaper. Fowler also stated that the Red Bay News is circulated in Red Bay, Vina, and western Franklin County. The Board also offered the affidavit of Bridget Berry, the

14

managing editor of the Red Bay News, who stated that the newspaper's circulation covers Red Bay, Vina, and western Franklin County.[4]

In response to the Board's summary-judgement motion, Pinpoint submitted the deposition testimony of its owner, Steve Martin, who testified that a request for sealed bids for the Cast Iron Replacement Phase was posted on the Board's bulletin board, located near its payment window, presumably by the Board. Pinpoint also offered the affidavit of Jacob Howell, the senior design engineer for Magnolia, who stated that Magnolia had emailed three utility contractors to inform them of the request for sealed bids for the Cast Iron Replacement Phase. Howell stated that he recalled two contractors attending a prebid meeting regarding the Cast Iron Replacement Phase, but that only Pinpoint submitted a bid.[5] Martin testified that, when Pinpoint submitted its bid,

[4]Pinpoint unsuccessfully moved to strike the affidavit of Berry, arguing that the statements therein were not based on her personal knowledge.

[5]According to Pinpoint, the Board had initially hired another contractor to perform the Cast Iron Replacement Phase of the project but that Pinpoint's bid for that phase had "lower unit pricing" than the other contractor's pricing. Pinpoint does not disclose why the other contractor did not perform the work for the Cast Iron Replacement Phase.

the utility industry was "extremely" busy because of low interest rates and that that reason could have contributed to the low bidding on the Cast Iron Replacement Phase. He further stated that it was not uncommon to have only one bidder on a rural utility project because of the limited number of hotels and restaurants in such areas.

Regarding Phases I, II, and III of the project, the Board argued in its motion for a summary judgment that requests for sealed bids for those phases were advertised only in the Red Bay News, which, the Board claimed, is not a newspaper of general circulation throughout the state.[6] In its response, Pinpoint offered evidence to indicate (1) that the Red Bay News had subscribers throughout the state; (2) that the Red Bay News canvases statewide issues in its published content; (3) that, in addition be being published in the Red Bay News, the requests for sealed bids in

---

[6]In support of its assertion that the Red Bay News is a newspaper of general circulation throughout the state, Pinpoint cites Ala. Att'y Gen. Op. No. 2004-018 (Oct. 31, 2003) (defining a newspaper of general circulation throughout the state, as referred to in former § 39-2-2(a), as one that "'publishes at least some items of interest to the general public, has more than a de minimis number of subscribers, with readers not confined to an isolated community or geographic region, and is available to any member of the public within the State ….'" (quoting Ala. Att'y Gen. Op. No. 97-00247 (Aug. 1, 1997))).

this case were also advertised on the Red Bay News's website, which is available worldwide; and (4) that the Red Bay News had also made the requests for sealed bids available on the Alabama Public Notices website, which is hosted by the Alabama Press Association. Pinpoint offered the affidavit of Jason Collum, the owner and publisher of the Red Bay News. Contrary to the affidavits of Fowler and Berry, Collum submitted a list of Red Bay News subscribers. Although the names and street addresses of those subscribers were redacted, the cities and zip codes were included, indicating that the newspaper had subscribers who lived in areas of the state other than Red Bay, Vina, and western Franklin County. Specifically, the list submitted by Collum demonstrated that the Red Bay News had subscribers in Hoover, Montgomery, Muscle Shoals, Titus, Russellville, Ohatchee, Cherokee, Vestavia, Trussville, Florence, Hamilton, Shannon, Albertville, Killen, Foley, Madison, Auburn, Tuscumbia, Mobile, Moulton, Haleyville, Center Point, Arley, Danville, Huntsville, Gadsden, Decatur, and Boaz. Collum also stated that the subscriber list he submitted was substantially the same as it was in 2021. Although Fowler stated in her affidavit that the Red Bay News is circulated in Red Bay, Vina, and western Franklin County, she admitted

17

in her deposition that she had no reason to dispute Collum's subscription list indicating that the Red Bay News has subscribers throughout the state. Fowler also agreed that the Red Bay News canvased certain statewide issues in its published content. Pinpoint also submitted a copy of an email exchange between Fowler and Collum, in which Fowler asked Collum if he could get requests for sealed bids for Phases I, II, and III of the project advertised in "this week's and next week's paper," to which Collum replied: "Yes, we will get these in starting this week for you, and we'll get them posted to our website and the [Alabama Public Notices] website as well." Collum also explained in his affidavit that the Red Bay News maintained a website and that, throughout 2021, bid advertising was included on its online version of the Red Bay News. Pinpoint also offered exhibits demonstrating that the Alabama Press Association "aggregates" public notices from qualifying Alabama newspapers and republishes them on its Alabama Public Notices website, which can be filtered to search for projects of particular types and in particular geographic locations. Pinpoint also relied upon exhibits demonstrating that "bid aggregators," such as the Alabama Bid Network and Construct Connect, collected the bid advertisement for Phase III of the project and

18

posted it on their subscriber networks. Pinpoint again relied on the affidavit of Howell, who stated that he had emailed three utility contractors to inform them of the requests for sealed bids for Phases I and II of the project and that he had contacted Pinpoint directly and informed it of the request for sealed bids for Phase III of the project because, he said, Pinpoint was already involved in other phases of the project. Howell further stated that Pinpoint had been the only contractor that had attended the prebid meetings for Phases I, II, and III and had submitted bids for those phases. Finally, Pinpoint offered the affidavit of Timothy W. Ayers, who had worked for the Alabama Utility Contractors Association since 2014 and who, at the time he submitted his affidavit, served as its executive director. Ayers stated the following in his affidavit:

> "5. In my experience, the utility industry often uses third-party public works bed aggregating companies to inform them of available jobs, which are up for bid. These companies compile the public notices of bids through their computer software and then inform contractors of available bids. Typically, this is done through a subscription service, which notifies the contractor of available bids, via email or other communication. Some companies, however, provide a searchable database of these bid notices, such as www.alabamapublicnotices.com, which is offered by the Alabama Press Association. Generally, the software allows the contractor to filter the universe of public works bid

opportunities to focus on a desired geographic region (for instance, the State of Alabama) and trade expertise (for exempt, gas line installation projects). It is my experience and understanding that over the past five to ten years, this bid notice aggregation service industry has become the primary way contractors in Alabama learn of public works utility bid opportunities.

"....

"7. It is my understanding that the Alabama State legislature revised the bid advertising laws in 2023, in part, to discontinue the requirement of advertising bids in newspapers of general circulation through the State, and only require now the advertising of bids in newspapers published in the municipality where the awarding authority is located. This revision occurred, in part, because of the proliferation of bid aggregating software companies, who are able to advertise the bids through their network once the local paper posts the advertised bid."

(Emphasis omitted.)

In viewing the evidence in a light most favorable to Pinpoint, we conclude that Pinpoint submitted substantial evidence creating a genuine issue of material fact as to whether the affirmative steps taken by the Board to advertise for sealed bids in this case substantially complied with the requirements set forth in former § 39-2-2(a).

## IV. Conclusion

We hold that there can be substantial compliance with the mandatory advertising requirements of § 39-2-2. We further conclude

20

that Pinpoint has submitted substantial evidence creating a genuine issue of material fact as to whether the Board substantially complied with the advertising requirements of former § 39-2-2. We, therefore, reverse the summary judgment entered in favor of the Board and remand the cause for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Stewart, C.J., and Wise, Bryan, Mendheim, and Cook, JJ., concur.

Shaw, J., dissents, with opinion, which McCool, J., joins.

SHAW, Justice (dissenting).

I respectfully dissent. Section 39-5-6, Ala. Code 1975, provides:

"The provisions of this title are mandatory, and shall be construed to require strict competitive bidding on contracts for public works. <u>The courts shall not invoke or apply any</u> principle of quantum meruit, estoppel, or any other legal or <u>equitable principle which would allow recovery</u> for work and labor done or materials furnished <u>under any contract let in</u> <u>violation of competitive bidding requirements as prescribed</u> <u>by law</u>."

(Emphasis added.) That Code section clearly bars the use of equitable principles to provide recovery for work performed pursuant to contracts let in violation of Title 39, Ala. Code 1975. The doctrine of substantial compliance is an equitable doctrine. <u>Pittman v. Pittman</u>, 419 So. 2d 1376, 1379 (Ala. 1982). I question whether using that doctrine to find that no violation of Title 39 occurred in the letting of the contracts in this case, thus allowing recovery for work under them, is permissible under § 39-5-6.

Further, § 39-5-6, by its terms, requires fidelity to the strictures of Title 39: "The provisions of this title are <u>mandatory</u>, and shall be construed to require <u>strict competitive bidding</u> on contracts for public works." (Emphasis added.) Caselaw suggests that substantial

22

compliance might be utilized to analyze compliance with <u>other</u> competitive-bidding laws or statutory-notice provisions; however, when it comes to the requirements of Title 39, this Court has recognized that entities should "strictly comply" with the notice requirements of § 39-2-2, Ala. Code 1975. <u>Bessemer Water Serv. v. Lake Cyrus Dev. Co.</u>, 959 So. 2d 643, 649 (Ala. 2006). And while certain opinions of the attorney general may state otherwise, "an attorney general's opinion is only advisory; it is not binding on this Court and does not have the effect of law." <u>Farmer v. Hypo Holdings, Inc.</u>, 675 So. 2d 387, 390 (Ala. 1996).

It is undisputed that the Water Works and Gas Board of the City of Red Bay did not "strictly comply" with the requirements of the applicable version of § 39-2-2. While it might seem inequitable to deny a contractor payment for work performed under a contract voided for failure to comply with Title 39, see § 39-5-1(a), Ala. Code 1975, equity follows the law.[7] But there is no need to invoke equity here. Title 39 provides contractors with

---

[7]"'Equity follows the law, and "when a … statute … is direct, and governs the case with all its circumstances, or the particular point, a court of equity is as much bound by it as a court of law, and can as little justify a departure from it." -- 1 Story's Eq. § 64.'" <u>Ex parte Lawson</u>, 6 So. 3d 7, 16 (Ala. 2008) (Lyons, J., concurring in part and concurring in the result) (quoting <u>Moulton v. Reid</u>, 54 Ala. 320, 324 (1875)).

protections from this very scenario. Specifically, § 39-5-1(b) requires an awarding authority to "certify that the contract to be awarded is let in compliance with this title and all other applicable provisions of law." That certification "constitute[s] a presumption that the contract was let in accordance with the laws," which may be rebutted only if "the certification is false or fraudulent <u>and</u> … the contractor knew that the certification was false or fraudulent before execution of the contract." <u>Id.</u> (emphasis added). Thus, unless the contractor "knew" that there was noncompliance with Title 39, the contract may be enforced. A contractor and others are "conclusively presumed to have notice of the provisions" of Title 39. § 39-5-5, Ala. Code 1975. In this case, by working under contracts without the statutorily required certification, Pinpoint Locating, Inc., did not avail itself of the protections provided by Title 39. Cf. <u>Ex parte Warren Averett Cos.</u>, 368 So. 3d 827, 836 (Ala. 2022) ("'"[E]quity serves the vigilant and not those who sleep over their rights."'" (citations omitted)).

24

Equity is neither allowed nor required in this case; therefore, I would not apply the doctrine of substantial compliance, and I would affirm the trial court's judgment.

McCool, J., concurs.